# EXHIBIT 2

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
                           ) File No. D-03211-A
GRACE CONSULTING CORPORATION  )

WITNESS:  Shawn A. Becker
PAGES:   1 through 283
PLACE:   Levy and Craig, P.C.
         1301 Oak Street, Suite 500
         Kansas City, MS  64106
DATE:    Friday, October 28, 2011

     The above-entitled matter came on for hearing,
pursuant to notice, at 9:12 a.m.

Diversified Reporting Services, Inc.
(202) 467-9200

---

Page 2

1  APPEARANCES:
2
3
4  On behalf of the Securities and Exchange Commission:
5     JENNIFER OSTROM
6     KURT GOTTSCHALL (telephonically)
7     Securities and Exchange Commission
8     Enforcement Division
9     Denver Regional Office
10    1801 California Street, Suite 1500
11    Denver, Colorado 80202
12    (303) 844-1047
13    ostromj@sec.gov
14
15
16  On behalf of the Witness:
17     ARTHUR E. FILLMORE, II
18     Levy and Craig, P.C.
19     1301 Oak Street, Suite 500
20     Kansas City, Missouri 64106
21     (816) 474-8181
22     afillmore@levycraig.com
23
24
25

---

Page 3

C O N T E N T S

WITNESS                    EXAMINATION
Shawn A. Becker                 5

EXHIBITS  DESCRIPTION              IDENTIFIED
11   E-mail to Shawn Becker, 10-14-11        8
12   Letter to Shawn Becker, 08-17-11        9
13   Letter to Grace Consulting, 08-17-11    9
14   Letter to New Vision, 08-17-11          11
15   Handwritten Notes, 09-20-11             13
16   Durable Power of Attorney               19
17   Background Questionnaire                22
18   Scottrade Brokerage Account Application  40
19   Letter to Jennifer Ostrom, 09-12-11     77
20   Letter to Shawn Becker, 07-15-11        88
21   Letter to Michelle Tidball, 06-29-09    111
22   CALI Shareholder Analysis               140
23   Consulting Agreement, 06-06-08          155
24   Consulting Agreement, 07-01-08          171
25   Worksheet                               182
26   Shipping Airbill                        183
27   Spreadsheet                             194
28   E-mail to Michelle Tidball, 05-24-10    195
29   Letter dated 01-12-10                   200

---

Page 4

EXHIBITS  DESCRIPTION              IDENTIFIED
30   Paperwork produced by Scottrade         227
31   Paperwork produced by Scottrade         234
32   CALI Summary                            259
33   New Vision Bank Account Info            275

1       P R O C E E D I N G S
2           MS. OSTROM:  Let's go on the record at
3   9:12 a.m. on October 28th of 2011.  Would you please
4   raise your right hand?
5   Whereupon,
6           SHAWN A. BECKER
7   was called as a witness and, having been first duly
8   sworn, was examined and testified as follows:
9           EXAMINATION
10   BY MS. OSTROM:
11       Q.  Would you please state and spell your full
12   name for the record?
13       A.  Shawn, S-H-A-W-N; Alan, A-L-A-N; Becker,
14   B-E-C-K-E-R.
15       Q.  My name is Jennifer Ostrom, and on the
16   phone is Kurt Gottschall.  We are members of the staff
17   of the enforcement division of the Denver regional
18   office of the United States Securities and Exchange
19   Commission.  We are officers of the Commission for
20   purposes of this proceeding, and this is an
21   investigation by the Commission in the matter of Grace
22   Consulting Corp., to determine whether there have been
23   violations to certain provisions to the federal
24   securities law.  However, the facts developed in this
25   investigation might constitute violations with other

1   federal or state civil or criminal laws.
2           Mr. Becker, today, if you don't hear a
3   question that I ask or don't understand something that
4   I ask, please tell me and I will clarify it or repeat
5   it.
6       A.  Okay.
7       Q.  The court reporter will not go off the
8   record at your request, only at my request, but if you
9   need to take a break for any reason or want to speak
10   with your counsel, just tell me.  I'll be happy to
11   accommodate you.
12       A.  Okay.  Thank you.
13       Q.  The other thing is, since she's the one
14   having to take the notes, you and I have to try to
15   make sure that we don't speak over each other.
16       A.  Okay.
17       Q.  So if you can, try to wait until I finish a
18   question before you say something.  It will help her
19   with the record, and I'll try to do the same and not
20   talk over you.
21       A.  Okay.
22       Q.  The other thing too is, if you could, be
23   verbal in your responses rather than nodding or
24   shaking your head or going "uh-huh."
25       A.  Right.

1       Q.  Say "yes" or "no."  Again, this will
2   clarify the record, okay?
3       A.  Okay.
4       Q.  Now, prior to the opening of the record,
5   you were provided with a copy of the formal order of
6   investigation in this matter, and it will be available
7   through your examination during the course of this
8   proceeding.  Mr. Becker, have you had an opportunity
9   to review the formal order?
10       A.  Yes.
11       Q.  And then also prior to the opening of the
12   record, you were provided with a copy of the
13   Commission's Supplemental Information Form 1662 and a
14   copy was also provided with your subpoenas, and a copy
15   of that notice has been marked as Exhibit No. 1.
16           Mr. Becker, have you had an opportunity to
17   read Exhibit No. 1?
18       A.  Yes.
19       Q.  Do you have any questions concerning
20   Exhibit No. 1?
21       A.  No.
22       Q.  I want to highlight for you Paragraph B2 of
23   the Form 1662.  It reads as follows:  You may be
24   represented by counsel who also represents other
25   persons involved in the Commission's investigation.

1   This multiple representation, however, represents a
2   potential conflict of interest if one client's
3   interest are or may be adverse to another's.  If you
4   are represented by counsel who also represents other
5   persons involved in the investigation, the Commission
6   will assume that you and counsel have discussed or
7   resolved all issues concerning possible conflicts of
8   issue.  The choice of counsel and the responsibility
9   for that choice is yours.
10           Do you understand this?
11       A.  Yes.
12       Q.  You're represented by counsel today?
13       A.  Yes.
14           MS. OSTROM:  And would counsel please
15   identify himself for the record?
16           MR. FILLMORE:  Arthur E. Fillmore -- It's
17   A-R-T-H-U-R.  Fillmore is F-I-L-L-M-O-R-E -- of the
18   firm Levy and Craig, L-E-V-Y and C-R-A-I-G.
19           MS. OSTROM:  And, Mr. Fillmore, are you
20   appearing today as counsel for Mr. Becker?
21           MR. FILLMORE:  Yes, I am.
22           (Exhibit No. 11 was marked for
23   identification by the court reporter.)
24           BY MS. OSTROM:
25       Q.  Mr. Becker, I'm handing

Page 13

1  mean yourself and Michelle Tidball?
2       A.  Yeah.
3            MR. FILLMORE:  Clarify who your attorney
4  was.
5            THE WITNESS:  Mike Dwyer.
6       BY MS. OSTROM:
7       Q.  And you did produce
8  documents in response to the subpoenas, correct?
9       A.  Yes.
10      Q.  Did you withhold any documents called for
11 by the subpoenas based on any claim of privilege?
12      A.  No.
13      Q.  Were any documents called for by the
14 subpoenas not produced for any reason other than
15 privilege?
16      A.  No.
17      Q.  Do you know of any documents responsive to
18 the subpoenas, but not provided to the staff, that
19 were in your possession at a prior time, lost or
20 destroyed or otherwise disposed of?
21      A.  No.
22           (Exhibit No. 15 was marked for
23 identification by the court reporter.)
24      BY MS. OSTROM:
25      Q.  Mr. Becker, let me hand

Page 14

1  you Exhibit No. 15.  This is numbered SB516 and the
2  second page is numbered SB514.  These are both
3  documents that, when you see SB, we received from you,
4  and we've put the numbers on.
5       A.  Okay.
6       Q.  These are handwritten notes.  The first
7  page, SB516, says bank and brokerages and a date of
8  09-20-11.  And then SB514, it says Brokerage Accounts
9  at the top and it's dated 09-29-11.  Did you draft
10 these two documents in response to the subpoenas?
11      A.  Yes.
12      Q.  Is the document -- are the documents
13 accurate?
14      A.  Yes.
15      Q.  If you could, look at the second page,
16 SB514.  There's a couple of questions I wanted to ask
17 you.  Under Ameritrade, Shawn Becker, the 886 account,
18 you said no activity, correct?
19      A.  Yeah, not through '08 or '11.  There might
20 have been a little bit a long time ago, but not very
21 much.
22      Q.  I have seen -- is it possible that there
23 are maybe a couple of trades in 2010?  Because I have
24 actually seen some activity.  Is that possible?
25      A.  I don't know.  I mean, not that I remember

Page 15

1  ever doing.  I mean, I don't -- I've looked for
2  records and I couldn't find anything.
3       Q.  If I have brokerage documents from TD
4  Ameritrade that show a couple of trades or a handful
5  of trades in that account, do you have any reason to
6  doubt that, if that's the case?
7       A.  No.
8       Q.  And then for Michelle Tidball, you have the
9  650 account.  Is it correct that she also had a
10 custodial account for Alexis at TD Ameritrade?
11      A.  Yes.  I failed to put that down.
12      Q.  That's all right.  Did you have POA on that
13 one also, a power of attorney?
14      A.  You know, I honestly don't remember.  All
15 we did at one time, when we were trying to fund the
16 kids' college, is, we moved some stock into there.  I
17 can't remember if -- I think I had POA, but I can't
18 remember.
19      Q.  Well, any activity in that account, would
20 that have been directed by you?
21      A.  Well, yeah.  If there's selling or any
22 buying or anything, that would have been directed by
23 me, and then I would tell her when I would do
24 something.  You know, I don't know if I had power of
25 attorney in that account or not.  I can't remember.

Page 16

1       Q.  When you say "her," you're referring to
2  Ms. --
3       A.  Right.
4       Q.  If there was any actual stock trading in
5  that account, it would have been directed by you, even
6  if you didn't have power of attorney; isn't that
7  correct?
8       A.  I probably placed the trade, but, you know,
9  it would have came to her daughter.  We discussed, you
10 know, what I was doing in that account.
11      Q.  I understand.  And then for the E*TRADE
12 accounts, you listed Michelle Tidball, New Vision and
13 Shawn Becker.  You didn't have a Grace account down.
14 Isn't it true that there was an actual Grace
15 Consulting account, but it was just never funded?
16      A.  I couldn't find any documentation on that.
17 I couldn't remember that for sure.  I might have
18 opened one and then never used it and then just thrown
19 the documents away or they closed the account, because
20 they had a policy that if you didn't use it, like six
21 months or something like that, they would just close
22 it, but I don't remember -- I couldn't find anything
23 on it.
24      Q.  My notes -- what I've seen is that on about
25 July 23rd of 2010, you requested a corporate transfer

Page 17

1    from the TD Ameritrade for Grace Consulting to
2    E*TRADE, but then that never went through.  Do you
3    recall that?
4        A.  When was it?
5        Q.  July of 2010.
6        A.  That I requested it from E*TRADE?
7        Q.  You were trying to transfer corporate --
8    the accounts that Grace Consulting -- you wanted to
9    transfer some of that stock into the E*TRADE account
10   in Grace Consulting's name, but it just never
11   happened.
12       A.  Yeah.  I don't remember why.
13       Q.  Do you remember if there was a Grace
14   account in E*TRADE?
15       A.  No.  To be quite honest, I don't even
16   remember doing that.  I must have forgotten about it.
17   I've had a lot of things going on.  I think we were
18   just trying to diversify the accounts at that time and
19   E*TRADE was a little bit cheaper, commission-wise.
20       Q.  My question is, though, if I have brokerage
21   statements and other documents from E*TRADE that show
22   there was a Grace Consulting account at E*TRADE, you
23   have no reason to doubt that that would be accurate;
24   is that correct?
25       A.  No.

Page 18

1        Q.  Did you have some custodial accounts for
2    Jack, Grace and Emma somewhere?
3        A.  Yeah, Ameritrade.
4        Q.  So those were at TD Ameritrade?
5        A.  Right.  The only reason I didn't list them
6    is because I didn't think you wanted those.
7        Q.  That's okay.  I just want to make sure.
8    Because you had control over those accounts; is that
9    correct?
10       A.  Right.
11       Q.  So with everything we've talked about and
12   what's on SB514, do you think that's all inclusive in
13   terms of the brokerage accounts that you controlled in
14   any way?
15       A.  I believe so.
16       Q.  May I look at that real quick?
17       A.  This (indicating)?
18       Q.  Yes.  Thank you.  I'm going to staple this
19   together to make sure that it stays together.
20           MR. FILLMORE:  This may be a good time for
21   me to bring up something that I discussed with you
22   earlier.  When you were talking to him about POA, I
23   think you're referring to a very specific POA
24   regarding an account, and Mr. Becker held a general
25   power of attorney from Michelle Tidball since 2004.

Page 19

1            THE WITNESS:  Actually, it was in '01.
2            MR. FILLMORE:  And I did bring copies of
3    it, if you want those.  I just want to clarify that
4    there was a power of attorney out there that covered
5    all these types of transactions without specifying any
6    POA over a specific account.
7            MS. OSTROM:  Why don't we go ahead and do
8    that right now.
9            THE WITNESS:  These are my only copies.
10           MS. OSTROM:  But we need to put them in as
11   exhibits, though.  You want to go off the record and
12   do it now since you've talked about it?
13           MR. FILLMORE:  Yes, since we're talking
14   about POAs.
15           MS. OSTROM:  That's absolutely fine.  We'll
16   go ahead and go off the record.
17           (Off the record.)
18           BY MS. OSTROM:
19       Q.  While we were off the
20   record, Mr. Becker, other than discussing baseball,
21   did we have any substantive discussions about this
22   investigation?
23       A.  No.
24           (Exhibit No. 16 was marked for
25   identification by the court reporter.)

Page 20

1            BY MS. OSTROM:
2        Q.  And, Mr. Becker, let me
3    hand you Exhibit No. 16.  The first three pages are a
4    Limited Durable Power of Attorney for Business and
5    Financial Decisions dated August 22nd of 2001, by
6    Michelle Tidball, appointing you the Power of
7    Attorney, and then the next one, two -- five pages is
8    a General Durable Power of Attorney for Business and
9    Financial Decisions, which is dated April 6th of 2004,
10   by Michelle Tidball, again, giving you the power of
11   attorney.  And then the last five pages are dated --
12   sorry -- a General Durable Power of Attorney for
13   Business and Financial Decisions dated April 6th of
14   2004, by Shawn Becker, and giving Michelle Tidball
15   power of attorney?
16       A.  Yes.
17       Q.  Let me hand you those.  Tell me if I've
18   stated accurately what those documents are?
19       A.  Yes.
20       Q.  And throughout where it's -- I believe
21   there's only -- the last page has your signature; is
22   that correct?  Is that your signature?
23       A.  Yes.
24       Q.  And what is the difference between the two
25   powers of attorney that Michelle Tidball gave you?

Page 21

1    A. You know what, I don't even remember. I
2 don't know if there is much difference other than if
3 we -- I think there was something in there that if we
4 divorced -- we were planning on getting married at the
5 time. If we divorced --
6    Q. So the second one in 2004 updated the 2001;
7 is that correct?
8    A. Yes. Because in 2004, we did wills and all
9 that kind of stuff.
10    Q. Now, your power of attorney that you gave
11 to Ms. Tidball, has that been revoked?
12    A. No.
13    Q. So it's still outstanding?
14    A. Yes.
15    Q. Has the powers of attorney, at least to
16 your knowledge, in any way changed that she gave to
17 you?
18    A. I don't think so. I mean, at one time --
19 no, I don't think so. We've had a power of attorney
20 in place forever.
21    Q. So she has not revoked it, to your
22 knowledge?
23    A. No, not to my knowledge. She did at the
24 brokerage firm one time, the power of attorney I had
25 there.

Page 22

1    Q. Not this general power of attorney right
2 now?
3    A. Yeah, not that I know of.
4    Q. I will let you clip those together.
5    MS. OSTROM: Kurt, do you have any
6 questions about this?
7    MR. GOTTSCHALL: No.
8    (Exhibit No. 17 was marked for
9 identification by the court reporter.)
10    BY MS. OSTROM:
11    Q. Mr. Becker, I'm handing
12 you what has been marked as Exhibit No. 17, which is
13 your completed background questionnaire. Did you
14 complete this questionnaire?
15    A. Yes.
16    Q. Are all statements contained in the
17 questionnaire complete, true and correct?
18    A. Yes.
19    Q. Do you adopt, for purposes of your
20 testimony today, all of the statements contained
21 within Exhibit No. 17?
22    A. Yes.
23    Q. The very first page of Exhibit No. 17, No.
24 4, what is your date of birth?
25    A. ███ 60. Sorry.

Page 23

1    Q. That's all right. That's why I go through
2 it. If you could, turn to page 3, No. 16, the
3 compensation salary. What does it say on the right?
4 I see Michelle, that we close -- well, "Michelle that
5 we use." That's all I can see. Is that --
6    A. Well, I based it off the tax returns that
7 we did for those years.
8    Q. Why did you write "Michelle"?
9    A. I meant that, you know, we used together --
10 whatever income, you know, came in, losses, whatever
11 we used together, whether we took a loss or -- even
12 though I traded and did all the things, we shared the
13 money.
14    Q. So the numbers that you put in on No. 16
15 are from your tax returns from 2008, 2009 and 2010; is
16 that correct?
17    A. Yes. Actually, my accountant is still
18 working on 2010. We were missing some documents. So
19 we were finishing that up. I just put in, you know,
20 some numbers from what he told me.
21    Q. Now, the one for 2008, it says, Trading and
22 Compensation, and it's a negative number, correct?
23    A. Right.
24    Q. So is that indicating a loss from trading?
25    A. Yeah. It's just an overall loss from

Page 24

1 trading and everything.
2    Q. Can you break down for me how much you lost
3 in trading and how much you had in compensation in
4 2008?
5    A. Not off the top of my head. I mean, I just
6 took that number from the tax return. I don't
7 remember. I don't think we did a lot -- had a lot of
8 compensation that year. It was more like '09 and '10.
9    Q. How would I find out -- what do you have
10 that would give me compensation for you for 2008 and
11 2009 and 2010, what kind of records?
12    A. Well, I would have to get my -- pull the
13 tax return and look at it again to see which were
14 traded and which were compensation.
15    Q. Did you break it down in the tax return?
16 That's what I am trying to get. I'm sorry.
17    A. Well, you know what, I don't know how he
18 did it exactly. I just told him what we did and he
19 figured, you know, the profits and losses, and if it
20 was compensation, what I got it for and where I sold
21 it, and then took into account, you know, all the
22 losses and things like that, the trading.
23    Q. I understand the trading part. What is it
24 that provides the compensation, and what kind of
25 documentation did you give to the accountant for that?

Page 25

1      A.  Well, I, basically, just told him, you
2  know, from what records we had, if I got stock and
3  what price I got it at and things like that.
4      Q.  Do you have records that give you the
5  compensation numbers that you could give to us?
6      A.  I thought I had on some of that, you know,
7  where the -- like, the deposits and the stock and
8  things like -- I thought I had put that in there.
9      Q.  Right.  I understand if you got stock as
10  compensation.  Did you have any money as compensation?
11      A.  In '08?
12      Q.  Yes.
13      A.  No.
14      Q.  That helps.  What about in 2009?
15      A.  Yeah, 2009, I think we had some money
16  coming -- I always did -- any deal I ever did, I
17  always did for stock.  I think 2009 was the first time
18  I ever took compensation in the form of cash.  It was
19  either late 2009 or early 2010.  I can't remember.  It
20  was from Verify Smart.
21      Q.  How much was that compensation?
22      A.  Well, some of it I paid out to other people
23  that were helping me.  So my -- I would have to go
24  back and look, but I think it was about -- maybe 70 or
25  80 grand, total.

Page 26

1      Q.  That you netted?
2      A.  Right.  But I would have to go back and
3  look at the records, the bank statements.
4      Q.  Can you recall how much total it was gross?
5      A.  Probably about 130,000 or -- 130 or
6  135,000, I think, total.
7      Q.  Any other cash compensation in 2009 that
8  you can remember?
9      A.  No.
10      Q.  How about 2010?
11      A.  No.
12      Q.  So no cash?
13      A.  No.  I didn't typically like working for
14  cash.
15      Q.  So when you give your accountant
16  documentation on your income, it includes the,
17  obviously, profit and losses in trading and there is
18  something for the value of the stock.  Is that how you
19  did it?
20      A.  Yeah.  That's how he told me to do it.  He
21  told me to put it -- you know, when I got it, what I
22  got it for and what I sold it for and, you know, if
23  there was a loss between what I got it and where I
24  sold it -- I don't know how he figured it, but I just
25  told him what it was and he figured it.

Page 27

1      Q.  So those amounts are included here in 16?
2      A.  I believe so, yes.
3      Q.  That would be the case for all three years?
4      A.  Yeah, whatever there was compensation-wise.
5          MS. OSTROM:  Kurt, do you have anything on
6  this one that you want to ask now?
7          MR. GOTTSCHALL:  Yeah.
8          BY MR. GOTTSCHALL:
9      Q.  In 2008, Mr. Becker,
10  with such large losses, how did you pay your living
11  expenses?
12      A.  Unfortunately, I borrowed -- we borrowed
13  against the account, the margin account.  So that was
14  like the net number after we paid off the margin and
15  everything else.  So we had money from, you know,
16  previous years from, like, '04, '05, '06, '07.  So we
17  had, you know, quite a bit of money at one time, and
18  then we borrowed against the account every month.  I
19  didn't always sell it.  In fact, I actually -- most of
20  the time, I ended up with more stock than I got and
21  ended up margining it and taking money out and
22  borrowing against the account.  We had large margin
23  interest payments that -- all those years.  Most years
24  we had large margin because we borrowed against the
25  account.  So I hardly ever sold anything unless I had

Page 28

1  to.
2      Q.  I want to make sure we understand the
3  nature of the compensation from 2008 forward.  You
4  haven't been employed by any entity, correct, as an
5  actual employee?
6      A.  Yeah.  I mean, I -- not for cash, but, you
7  know, I put in the documentation that I received stock
8  in some companies.
9          MR. FILLMORE:  He's asking you whether you
10  received W-2 type income.
11      A.  No.
12          BY MR. GOTTSCHALL:
13      Q.  So when you did work
14  from 2008 forward, it's always been in a consulting
15  capacity; is that correct?
16      A.  Correct.
17      Q.  And have you -- I take it the only forms of
18  compensation from those entities that you have done
19  consulting work for has been in cash compensation in
20  limited circumstances and stock?
21      A.  Yeah.  It was only one time for cash.  And
22  every other deal I've ever done with anybody has been
23  in the form of stock.
24      Q.  So no other form of compensation from these
25  issuers other than cash or -- and then most of the

1 whole thing, to tell you the truth.
2 Q. Where did you get the million free-trading
3 shares? Because they would have had to come from
4 somewhere else; they can't come directly from the
5 company, correct?
6 A. I don't know. It came from him. I don't
7 know where he got it from, if he borrowed it from a
8 third party or -- maybe he had his own stock. I don't
9 know, but I got it from him.
10 Q. Mr. Sepe provided it, though?
11 A. Yeah, he provided it.
12 Q. I forgot to ask you this. Is that the same
13 thing with Verify Smart, Mr. Scammill provided you
14 with 100,000 free-trading shares as opposed to
15 directly from the company?
16 A. Yeah. He said he was getting it from
17 someplace. I think he said he was getting it from a
18 third party or something like that, you know, somebody
19 interested in the company that -- you know, I don't
20 know where. I don't ask.
21 Q. Now, what specific services did you provide
22 for Xynergy Holdings?
23 A. Same thing as all the other companies,
24 introduced people to the company and told them about
25 the technology and -- those two duties -- I really

1 didn't work on it for very long, because both of those
2 people got crazy after a couple of months and, you
3 know, started wanting me to do this and that, you
4 know, as far as the shareholders. I just didn't --
5 couldn't work for somebody like that.
6 Q. And approximately how many people did you
7 bring into this stock?
8 A. That, I have no idea. I didn't -- you
9 know, I have no idea. To be honest with you, I didn't
10 keep track on that one.
11 Q. Anyone else that you know that was a
12 consultant to Xynergy?
13 A. Not that I know of. I think he hired other
14 people. One thing I didn't like about it, he hired
15 all these guys that were, like, e-mail guys and things
16 like that. That was another thing I didn't like about
17 it. Those are just roads to disaster, when you hire
18 those e-mail guys. He hired some of those.
19 Q. What do you mean by "e-mail guys"?
20 A. Those guys that do the e-mail blasts and
21 stuff, because I even got -- I didn't even know he
22 hired them. And then all of a sudden, I get an e-mail
23 saying -- by Xynergy Corp. So I got one of those.
24 That was another scary thing that I didn't like about
25 it, because he hired e-mail guys, and all those things

1 just go up and down and they're in the toilet.
2 Q. And then the consulting agreement itself --
3 I'm still looking at the one that you provided, which
4 is SB440. The third line down says -- under A --
5 Consultant possesses special skills, knowledge and
6 qualifications beneficial to the business of the
7 company. Other than bringing in possible
8 shareholders, were there any other special skills,
9 knowledge or qualifications that you provided?
10 A. No, because we didn't really work on it
11 that long, a couple months -- a couple three months,
12 or I worked on it. So there really wasn't any need.
13 He was funding the company, I think. So he never
14 really asked for -- I don't think they ever did a PPM
15 or needed my services for anything else, just to
16 promote investor awareness.
17 Q. No. 2, under Duties, do you see that
18 section?
19 A. Uh-huh.
20 Q. It says, Consultant shall be engaged to
21 provide consulting services for the company with
22 respect to the conduct of its business affairs. Did
23 you ever do that?
24 A. No.
25 Q. The third sentence says, The company may

1 instruct the consultant to perform services for its
2 clients and customers. Did they instruct you to
3 perform any services for clients or customers?
4 A. No.
5 Q. And was there anyone else who was helping
6 you with these -- Xynergy solicitation of investors?
7 A. Gosh, I don't remember. I don't think
8 anybody -- I don't think I even subcontracted anything
9 out to anybody. It was such a short-term thing. I
10 mean, you know, we started having problems after the
11 first or second month. So I quit right after that.
12 MS. OSTROM: Kurt, do you have anything
13 else on this one?
14 MR. GOTTSCHALL: No.
15 MR. FILLMORE: Is there going to be a --
16 MS. OSTROM: This might be the one.
17 Because I wanted to cover the older stuff first. Is
18 this okay with you, Kurt? I know it's early out
19 there.
20 MR. GOTTSCHALL: No, that's fine. What
21 time do you want to get going again?
22 MS. OSTROM: Is 1:00 okay or -- try to, at
23 least close to it?
24 MR. FILLMORE: Yes.
25 MS. OSTROM: So 12:00, your time?

Page 133

1    MR. GOTTSCHALL: Yes.
2    MS. OSTROM: Okay. Do you want to talk to
3  me? Should I call you at lunch then? Is that okay?
4  I'll hang up on you now.
5    MR. GOTTSCHALL: Yeah. Are you going to
6  call right now?
7    MS. OSTROM: Yeah, I will. I'll call you
8  on my Blackberry when I get out. Why don't we go
9  ahead and we'll go off the record for lunch.
10   THE FILLMORE: That'd be great. Thanks.
11   (Whereupon, at 12:00 p.m., a luncheon
12  recess was taken.)
13   A F T E R N O O N   S E S S I O N
14   MS. OSTROM: Let's go back on the record at
15  1:08 p.m.
16   BY MS. OSTROM:
17   Q.  While we were off the
18  record, Mr. Becker, did we have substantive
19  discussions regarding this investigation?
20   A.  No.
21   Q.  Now, on Exhibit 19, 1C references the China
22  Auto Logistics Company, and you said that you had an
23  oral agreement with them; is that correct?
24   A.  Correct.
25   Q.  And who were your contacts for that

Page 134

1  agreement?
2    A.  Paul Kelly.
3    Q.  So your oral agreement was with Mr. Kelly
4  or was it with China Auto Logistics?
5    A.  Paul Kelly.
6    Q.  What was the substance of the agreement, as
7  you can recall?
8    A.  Just the same thing, to disseminate public
9  information, do IR, try to build the shareholder base,
10  get it out there. He didn't really ask me to do
11  anything else.
12   Q.  And at some point, did you actually meet
13  people from China Auto Logistics? Is that what you
14  were talking about earlier?
15   A.  Yeah. Well, before I even started, I
16  wanted to, you know, meet the people, meet the company
17  and things like that. So he said, By the way, they're
18  coming in. I think it was late 2009, in October or
19  something. The Chinese was coming in to do a road
20  show, and they were starting in Arizona and going to
21  California and Las Vegas and New York. They were
22  spending, like, two weeks here. And Paul said, Why
23  don't you come out and meet the company and see if you
24  are interested in doing it? So that's what I did.
25   Q.  Who paid your expenses?

Page 135

1    A.  Well, I paid for everything but my room.
2  He booked all the rooms.
3    Q.  And what were the terms of your agreement
4  with Mr. Kelly with regards to China Auto Logistics?
5    A.  Just to do the investor relations and at
6  some point, they were going to raise money and develop
7  the PPM to try to help them raise money -- or
8  introduce them to raise money for the PPM.
9    Q.  Other than the soliciting shareholders for
10  the company, did you provide any other services?
11   A.  No.
12   Q.  What compensation did Grace receive for
13  providing the services?
14   A.  Well, it was not just me. It was Grace,
15  Douglas and Steven Rosner. But it was probably
16  about -- I want to say about 360,000 shares total
17  between all of us. It might be plus or minus a few.
18  I don't remember exactly, but that was about the
19  number.
20   Q.  And did you negotiate the agreement with
21  Mr. Kelly on behalf of Mr. Rosner and Mr. Weil?
22   A.  Yes.
23   Q.  Were they your subcontractors, essentially?
24   A.  Yes.
25   Q.  Do you remember what the split was between

Page 136

1  you?
2    A.  Originally, it was a third, a third, a
3  third; and then when -- I think we got a second batch.
4  And then Mr. Rosner was doing something else, so
5  Douglas and I split the other. I think it was about
6  120,000 shares, but I think the original amount went
7  three ways.
8    Q.  So how many, total, did Grace end up
9  receiving?
10   A.  About 180.
11   Q.  Were they freely-traded shares?
12   A.  Yes, they were.
13   Q.  Do you know where the shares came from?
14   A.  No. Paul Kelly arranged that. I think it
15  was just part of that 2 percent or -- it was either 1
16  or 2 percent, depending on the deal, the IR that they
17  had budgeted.
18   Q.  Right. But were they freely-traded shares
19  coming from --
20   A.  I know they came from him. I would have to
21  look, you know, at the transfer agent or something to
22  find out where they came from. I don't know. I don't
23  know if they came from one of his entities or somebody
24  else's.
25   Q.  Did you give Mr. Weil 180,000, also? Is

Page 137

1  that how that worked?
2      A.  Yeah.  I'm trying to think of that number.
3  Let me think about this number for a minute, make sure
4  I give you the most accurate number I can think of.  I
5  know we had got 180 and we split it three ways, of 60,
6  60 and 60.  And then I think we might have gotten -- I
7  don't think it was that much.  I think he and I got,
8  like, one -- maybe 110 apiece or something like
9  that -- no, that's not right.  Rosner didn't get that
10  much.  Steven only got about -- probably 80,000 shares
11  of it, total.  So that would be, like 140 apiece,
12  something like that.
13      MR. FILLMORE:  If you don't mind, I would
14  like to disagree.  You've said twice that
15  freely-traded shares can't come from the company, but
16  I've seen, particularly, in reverses into shells where
17  a portion of the registration is not completely
18  issued and was issued to IR consultants or someone
19  like that.  And so I'm just -- as a matter of fact,
20  that they can --
21      MS. OSTROM:  I understand exactly where
22  you're coming from.  Let me make a statement, and I
23  will make --
24      MR. FILLMORE:  Okay.
25      BY MS. OSTROM:

Page 138

1      Q.  I have not seen in any of
2  these entities that we are now discussing that any of
3  them have SA or any other type of disclosure of
4  providing any freely-traded shares to any consultants
5  in any of their filings.
6      A.  Okay.
7      MS. OSTROM:  I apologize.  I should have
8  made that premise.  So thank you very much for
9  bringing that up.
10      MR. FILLMORE:  That's okay.
11      A.  I think it just came out of his -- whatever
12  the company left him with his block or -- you know,
13  because he had so many expenses or something, and
14  they -- you know, whatever was left over -- because he
15  did the reverse and all that stuff.
16      BY MS. OSTROM:
17      Q.  I apologize, because I
18  think I misunderstood you at the beginning of -- that
19  Mr. Rosner and Mr. Weil and Grace all took shares out
20  of the 660,000.
21      A.  Right.
22      Q.  I'm sorry.
23      A.  Well, I don't think it originally started
24  out as Grace.  It was Michelle.  Because I didn't
25  use -- I don't think -- I think I put some of it in

Page 139

1  Michelle and some of it in Grace, because we didn't
2  use Grace until the end of '09.  So I think it went in
3  her name.
4      Q.  Do you know when the agreement was with
5  Mr. Kelly for China Auto Logistics?
6      A.  Sometime -- like the summer of '09.  I'm
7  not a very good record keeper, but I know it was in
8  '09.  I think it was about the summer.  It could have
9  been late fall, but it was right in there.
10      Q.  Other than the freely-traded shares that
11  you received, was there any other compensation?
12      A.  No.
13      Q.  Do you know of any other consultants, other
14  than Mr. Rosner and Mr. Weil?
15      A.  Well, I think they used that group out of
16  Arizona.
17      Q.  What was that name again?
18      A.  You know what, I don't know.  I think they
19  are part of that Focus Asia Partners group or
20  something.  Because I remember getting the guy's card
21  and I thought it said Focus Asia Partners on it.  The
22  guy is Rich somebody, but I don't remember his last
23  name.  I never talked to them at all.  I might have
24  gotten a report here and there that Paul or somebody
25  had sent me that they had or their firm had written,

Page 140

1  but I never talked to them.
2      Q.  Focus Asia Partners -- Mr. Agriogianis is
3  part of that, correct?
4      A.  Yeah, I think he's part of that, too.
5      Q.  What did Focus Asia do for China Auto
6  Logistics?
7      A.  I don't know.  I know they wrote reports
8  and helped them with reports and disseminate
9  information and, you know, they might have been
10  involved in money raises or something like that.  I
11  really don't know.  I didn't talk to them about that
12  at all.  I just kind of focused on my part and didn't
13  really focus on what anybody else was doing.
14      Q.  Other than Focus Asia Partners, do you know
15  of any other consultants that China Auto Logistics
16  had?
17      A.  No.  He talked about someone at the
18  beginning, but he never told me who they were.  He
19  just said that they didn't work out.  That's why, when
20  he heard about me, he called me.
21      Q.  Was China Auto Logistics the first deal
22  that you did with Paul Kelly?
23      A.  Yeah.  Yes.
24      (Exhibit No. 22 was marked for
25  identification by the court reporter.)

Page 149

1 or twice on the phone, but I didn't talk to him on a
2 regular basis.
3     Q.  The next thing down is Robert Fineblatt.
4 Do you know who that is?
5     A.  No.
6     Q.  Do you know why your name, Shawn, is next
7 to his -- the buy and current?
8     A.  No.  Because that next one down, Steven
9 Port, that's a friend of mine, and they've got Brian
10 next to his.
11     Q.  Do you know who Brian is referring to?
12     A.  No.
13     Q.  Okay.
14     A.  I think we were just assuming -- if he
15 didn't know who it was or somebody else told him about
16 another guy or something, I think he was assuming that
17 anybody that was left were my people that I had
18 contacted.
19     Q.  Do you know who MM stands for?
20     A.  No.
21     Q.  How about AW?  That's down a little
22 farther.
23     A.  Where is that one?  No, I don't know AW
24 either.  See, I didn't take these things to heart
25 because, you know, I hear so many mixed things about

Page 150

1 what the SEC shows, the NOBO shows.  I have one guy
2 telling me that the NOBOs don't show anything, and
3 then Paul says they do.  So I just never paid
4 attention to any of this stuff.
5         Because he says if -- somebody told me, if
6 you're at a brokerage firm and you sign an
7 objectionable shareholder's thing, you're not -- it
8 don't show up anywhere.  So I just discounted all this
9 stuff, and I didn't even really pay attention to it.
10         MR. FILLMORE:  I would like to clarify with
11 him one thing, because I want to make sure he's
12 answering it accurately.  When you're talking about
13 Roger Lockhart and CALI, was Roger Lockhart not at
14 that meeting with you in Phoenix when you met the CALI
15 people?
16         THE WITNESS:  Yeah, he was at that meeting.
17 I said that at the first couple of meetings, that's
18 where I met Roger, was at that meeting; and he was
19 introduced as an investor.
20         BY MS. OSTROM:
21     Q.  That was the first time
22 you had ever met him?
23     A.  Uh-huh.
24     Q.  Did you know that he had been a broker at
25 any time, a stockbroker?

Page 151

1     A.  Yeah, I knew that.  He told me that he was
2 a broker at one time, a long time ago, and that he
3 sold his book to somebody else or something.  I
4 honestly didn't really even talk to Roger that much.
5 I didn't talk to Roger probably -- I met him at a
6 couple of meetings and I might have talked to him a
7 couple of times, but I didn't really -- until Paul
8 kind of fell off the radar map, I didn't really talk
9 to anybody until the last six or eight months, and
10 Paul kind of made Bob Agriogianis the point guy for
11 any information, if you had any questions or
12 information, or whatever.
13         But Roger -- the only time I ever spoke to
14 him was about -- you know, we'd talk about trading
15 ideas or something.  Nothing to do with, you know,
16 these companies.  If I had a question -- I might ask
17 him a question about China or something because he
18 went over there with the group all the time, to China.
19     Q.  Do you recall how many people you brought
20 into China Auto Logistics, in general, an estimate?
21     A.  I don't know.  I had a lot of larger
22 shareholders in that one.  Probably 50 or 60.  It
23 could have been more than that.  I don't know, because
24 a lot of these guys told other people about it.  So it
25 might have been more than that.

Page 152

1         MS. OSTROM:  Kurt, do you have anything
2 else right now on this?
3         MR. GOTTSCHALL:  No.
4         BY MS. OSTROM:
5     Q.  On Exhibit No. 19, going
6 back to that, 1D is Guanwei, G-U-A-N-W-E-I, Recycling
7 Corporation.  Did you have an agreement with Mr. Kelly
8 for that one, also?
9     A.  Yes.
10     Q.  When was that?
11     A.  That was, like, early 2010, I want to say,
12 March or April.
13     Q.  That was also an oral agreement?
14     A.  Yes.
15     Q.  Other than Mr. Kelly, did you have any
16 contacts for the agreement?
17     A.  No.  What do you mean "contacts for the
18 agreement"?
19     Q.  At the company or anyplace else that you
20 negotiated the --
21     A.  No.  I met -- they brought the guy over
22 from China one time to New York, and I met the company
23 there.  That was the only contact I've ever had with
24 the company.
25     Q.  What specific services did you provide for

Page 153

1  Guanwei?
2      A.  Same thing, just investor relations.  I was
3  told down the road that they were going to do a PPM.
4  So when they did a PPM, I was going to help them, you
5  know, try to find a buyer for the PPM.
6      Q.  Did that ever happen?
7      A.  I'm trying to think.  Yeah, I -- that, and
8  I introduced them to Steven Rosner, who had a lot of
9  contacts in the recycling business and he was working
10  on something, but I don't know if anything ever came
11  to fruition with that or not.
12      Q.  So you don't know if he helped with any
13  finances?
14      A.  I think he introduced them to a few people,
15  but I don't think they ever did anything, because all
16  those companies had tons of cash.
17      Q.  So when you say you did the usual IR stuff,
18  you're referring to bringing in shareholders?
19      A.  Yes.
20      Q.  What compensation did you receive for
21  providing those services?
22      A.  I don't think we did very much for that.  I
23  think we got about -- between the three of us, I think
24  we split 220,000 shares three ways, so whatever that
25  equates to.

Page 154

1      Q.  So this is Mr. Rosner, Mr. Weil and
2  yourself?
3      A.  Right.
4      Q.  And do you know where that stock came from?
5      A.  The same place.  I think Paul had a group
6  and the same group did all the deals, and everything
7  came from that group, but I couldn't tell you which
8  person or entity it came from.
9      Q.  Were they freely-traded shares?
10      A.  Yes.
11      Q.  Any other compensation except for that?
12      A.  Nope.
13      Q.  Anyone else that you knew of that received
14  compensation for consulting other than the three of
15  you for Guanwei?
16      A.  I'm sure that group in -- I think that
17  group in Arizona got compensated every time, too.
18      Q.  Focus Asia?
19      A.  Yeah.
20      Q.  What makes you believe that?
21      A.  Well, I just assumed that because, you
22  know, they worked on the deal too and put out reports
23  and things like that.  I've never known anybody to
24  work for free.
25      Q.  Anyone else that you know of?

Page 155

1      A.  Not on my end.  You know, he didn't tell
2  me -- like I said before, I just focused on what I
3  did.  I didn't ask a lot of questions, who else was
4  working on it.  I didn't care.
5      Q.  How many people did you bring in as
6  shareholders for Guanwei?
7      A.  Probably about the same amount.  Because
8  most everybody that bought the CALI bought the
9  Guanwei, because they liked China.  That was at the
10  time when China was doing really well.  I mean, all
11  those companies had great earnings and revenues and
12  cash and all kinds of stuff, and they were NASDAQ.
13      MS. OSTROM:  Kurt, do you have anything on
14  this one?
15      MR. GOTTSCHALL:  No.
16      (Exhibit No. 23 was marked for
17  identification by the court reporter.)
18      BY MS. OSTROM:
19      Q.  Mr. Becker, let me hand
20  you Exhibit No. 23.  This is numbered ST55 through
21  ST59.  This says Consulting Agreement dated June 6th
22  of 2008, between Holloman Energy Corp., slash, Grant
23  Peterson --
24      A.  Right.
25      Q.  -- Grace Consulting Corp., and the last

Page 156

1  page shows the consultant is Grace Consulting
2  Corporation, Michelle Tidball, president, dated
3  06-06-08.
4      A.  Right.
5      Q.  Now, I know in Exhibit No. 19, you had
6  said, under 1E, that you believe there was a written
7  agreement with Holloman Energy, but you couldn't find
8  it.  Is this the agreement?
9      A.  Yeah, but you know what, this didn't
10  ever -- this wasn't the agreement.  We ended up using
11  an oral agreement, because I didn't get a million
12  shares of stock.  Because everything I got, I got
13  through -- Jimmy O'Callaghan arranged.  I don't know
14  if Grant Peterson was the one that did it, but we
15  ended up not doing this -- the million shares.  It
16  only ended up being a total of -- I think I got 500,
17  200 and 100.
18      Q.  This looks similar to the agreement that
19  you showed us earlier, that Michelle Tidball had typed
20  up.  You said you needed a template.  Is that why this
21  was done?
22      A.  Yeah.  I had one -- I think I actually got
23  this from -- I mean, I didn't write this; a lawyer did
24  this.  I think it was Douglas Weil that gave me the
25  template.  It was one he used for different consulting

Page 157

1   things in the past, and he sent me a copy of it and
2   said I could use it.
3       Q.   Now, you're saying that you don't believe
4   that this ever went into effect; is that true?
5       A.   Right, because it never -- because it was a
6   year -- I think it was -- you know what, this one
7   was -- we were going to do a second bunch or
8   something.  I don't think this was the original deal
9   that we did.  I think we were going to do a second
10  bunch and we never did that.
11      Q.   Did you have a consulting agreement with
12  Holloman Energy in 2008?
13      A.   I had one with Grant Peterson.
14      Q.   With him, personally?
15      A.   Well, see, I don't know how it worked.  It
16  came through Jimmy O'Callaghan, and he said -- he told
17  me that I needed to get a consulting agreement.  I did
18  this one and then he never -- we never did anything
19  with it.  And then they went ahead and did some stuff
20  with it.  It was, like, a year later that I got my
21  first 500,000 shares, and then I got another 200 and
22  100, but I don't think this one ever went into effect,
23  because I didn't ever get a million shares and I
24  didn't ever -- and that didn't come through Grant
25  Peterson.  It came from -- well, I don't know where.

Page 158

1       Q.   So my first question is, why did you send
2   this consulting agreement to Scottrade when they
3   needed a consulting agreement related to the Holloman
4   Energy shares?
5       A.   Because I thought this was the one that we
6   did originally, and they wanted to know -- because I
7   talked to Grant and he told me that I could use this
8   one.  They wanted to know how I got the shares, and I
9   told them that I didn't get a full million shares.  I
10  only got 800,000, and he told me to use this one.
11      Q.   So am I correct -- and tell me if I'm
12  wrong -- that this agreement, Exhibit No. 23, never
13  went into effect, but you did do something for
14  Holloman Energy and Mr. Peterson told you to go ahead
15  and use this so that Scottrade would take the shares
16  in; is that correct?
17      A.   Yeah.  We had a verbal agreement, but a
18  different one than this.  He said that if you have a
19  consulting -- he said, Use the other consulting
20  agreement we have.  Because he was way up in
21  Saskatchewan or something.  He was always traveling
22  abroad.  Actually, I think it was for the first
23  500,000 they sent me -- or wherever it came from.  I
24  don't know.  Jim O'Callaghan arranged it.  It just
25  showed up.

Page 159

1       Q.   Who told you to use this consulting
2   agreement, Exhibit No. 23?
3       A.   Grant Peterson.
4       Q.   So Mr. Peterson, personally, told you that?
5       A.   Yes, because Scottrade wanted to know how
6   we got it.
7       Q.   What was your agreement with Mr. Peterson
8   of Holloman Energy?
9       A.   Just the -- he was, like, a liaison of the
10  company, too, and he just wanted me to provide -- in
11  fact, he resigned, I think, shortly after this and
12  became just a liaison of the company and was just to
13  provide investor relations, too.
14      Q.   On the very last page, ST59, this shows
15  Grant Peterson as president of Holloman Energy.
16      A.   He was president at one time.
17      Q.   So when you first negotiated with him, was
18  he president?
19      A.   Yes.
20      Q.   Then he resigned subsequent to that, is
21  your understanding?
22      A.   Yes, because he couldn't -- I don't even
23  remember what the reason was why he resigned, but he's
24  still affiliated in some respect.  I think he became
25  more of a consultant to the company than a president.

Page 160

1       Q.   What terms did you negotiate with
2   Mr. Peterson?
3       A.   Well, originally, we did the -- I think --
4   I'm trying to remember if this one was the first one
5   or we were going to do a second one and we never did
6   it.  The first one ended up being in effect before the
7   second one, because I didn't get the shares until -- I
8   thought I was actually going to get screwed, to tell
9   you the truth.  And then the 500,000 shares showed up
10  one day.  I guess Jimmy O'Callaghan, over in Dublin,
11  you know, made him send it, because I had been working
12  on the company already under the assumption --
13      Q.   Let's just back up then and talk about the
14  actual terms.  The terms you got 500,000 shares
15  of freely-trading stock?
16      A.   Right.
17      Q.   What were you doing for the company?
18      A.   Investor relations, just like other
19  companies.
20      Q.   And you discussed that with Mr. Peterson
21  specifically himself individually?
22      A.   Yes.
23      Q.   What did he ask you to do?
24      A.   Just do the investor relations as far as
25  investor awareness.  Obviously, the company knew,

Page 169

1    million shares, but we never did.  We only got to
2    800,000.
3         BY MR. GOTTSCHALL:
4         Q.  How did you obtain
5    Mr. Peterson's signature on the agreement?  Did you
6    e-mail it to him, fax it to him?
7         A.  Faxed it to him.
8         Q.  And then he signed it and faxed it back to
9    you?
10        A.  Yeah, I assumed he signed it.  That's what
11   I got back.  I never have met Grant.  I don't even
12   know -- you know, he's all over the world all the
13   time.  So I -- at that time, I faxed it to a number
14   that he told me to fax it to, and that's what I got
15   back.
16        Q.  And you had testified earlier that this
17   was -- sort of that consulting arrangement was
18   between -- you understood it was between Holloman
19   Energy and Mr. O'Callaghan; is that right?
20        A.  Yeah, I think it was between himself, Grant
21   and the company.
22        Q.  What do you mean by that?
23        A.  Well, I mean -- I assumed Grant worked for
24   the company and Grant worked with Mr. O'Callaghan, and
25   I assumed it was all put together through those three

Page 170

1    entities.  I mean, Grant -- you know, he called
2    himself the president, but at that time, I never
3    really knew if he was still the president or just a
4    liaison, because he was -- I know he was a consultant
5    to the company, but I don't know.  Maybe that's a
6    title he gave himself.  I don't know.  But that's what
7    he always called himself, was president, for a while,
8    and then all of a sudden, he was consultant to the
9    company.
10        Q.  What was your understanding as to what
11   Mr. O'Callaghan was doing for Holloman?
12        A.  I assumed he was doing the same thing I was
13   doing, just over in Europe.
14        Q.  In other words, calling and doing investor
15   relations and calling folks that might be interested
16   in buying the stock?
17        A.  Right.  I mean, from what I understood, he
18   had a huge network over in Europe of, you know,
19   investors and people that he knew.  So I assumed that
20   that's what he was doing over there.  He worked for
21   HP, for Hewlett Packard, too, but he did that on the
22   side, I know.
23        MR. GOTTSCHALL:  That's all I have.  Go
24   ahead, Jennifer.
25        BY MS. OSTROM:

Page 171

1         Q.  And then, Mr. Becker,
2    looking at Exhibit No. 19 again, can you hand that to
3    me for just a minute?
4         A.  Sure.
5         MR. FILLMORE:  Shawn, it will be really
6    helpful when you're referring -- when there's
7    confusion about Mr. Peterson and Mr. O'Callaghan --
8    you use a lot of "he" and "himself," and sometimes
9    it's not clear, at least to me, who you're referring
10   to and when -- these relationships are kind of
11   complex.
12        THE WITNESS:  So just use their name?
13        MR. FILLMORE:  Whenever it is confusing,
14   yes, please.
15        THE WITNESS:  Okay.
16        (Exhibit No. 24 was marked for
17   identification by the court reporter.)
18        BY MS. OSTROM:
19        Q.  Mr. Becker, let me hand
20   you Exhibit No. 24.  This is numbered ST8 through
21   ST17.  This is entitled Consulting Services Agreement,
22   effective July 1st of 2009, between Duke Enterprises,
23   LLC, on behalf of FormCap, F-O-R-M-C-A-P, Corp. and
24   Grace Consulting Corporation and Michelle L. Tidball.
25   And then page 17 -- ST17 shows a Robert Schwarz,

Page 172

1    S-C-H-W-A-R-Z, as president of Duke Enterprises and
2    Michelle L. Tidball as president signing.  Let me hand
3    you that and ask you if you have seen this before.
4         A.  Yes, but I couldn't -- I didn't find
5    that -- or I couldn't find it.  I don't think I sent
6    this to you, did I?
7         Q.  That's okay.  You had said that you thought
8    you had an agreement, but you weren't sure if it was
9    oral.  It was in on our exhibits.
10        A.  Yeah.
11        Q.  So is -- was this a consulting agreement
12   that was in effect with -- for FormCap?
13        A.  Well, Duke had one with FormCap, and then
14   he wanted to do one with me to -- he was, like,
15   subbing it out, like I did with Douglas Weil and
16   Steven Rosner.
17        Q.  So were you a subcontractor for Duke
18   Enterprises then?
19        A.  Yes.
20        Q.  Did you ever have any contact with anyone
21   at FormCap?
22        A.  No.  I talked to Terry -- somebody who was
23   like a Paul Kelly, who was the consultant to the
24   company that Duke Enterprises introduced me to, but
25   that's the only person associated with the company

Page 173

1  that I ever talked to.  This one was -- now that I
2  think about it, this was -- I still have all the
3  shares except for -- I don't remember how many this
4  was for.  Was this for, like, 500 or 750 or something
5  like that?
6      Q.  The second page, ST9, says two million
7  shares under 3.1.
8      A.  I didn't get two million shares.
9      Q.  How many did you get?
10     A.  I believe it was 750,000 restricted, which
11  I still have.
12     Q.  Did you buy some on the market then?
13     A.  Yeah, I bought some on the market.
14     Q.  How much did you buy; do you remember?
15     A.  I don't know.  It was in that questionnaire
16  thing you gave me.
17     Q.  On the other ones you knew.  Like Holloman,
18  you knew it was 1.2 million.  That's why I asked.
19     A.  Well, I didn't -- I wasn't associated with
20  this for very long, because as soon as we started
21  doing it, it started getting short and it just went
22  straight down.  And then the guy was, you know, trying
23  to do this and that and he never did it.  He wouldn't
24  talk to anybody.  So we just, kind of, gave up on the
25  thing.  I just kept -- the 750,000 -- I tried to call

Page 174

1  him.
2      Q.  You're talking about Mr. Schwarz?
3      A.  No.
4      Q.  Who else?
5      A.  This Terry somebody, who was -- he was the
6  one that brought in Mr. Schwarz, but then he wouldn't
7  talk to Mr. Schwarz.  He wouldn't talk to me.  He
8  wouldn't talk to anybody.  It just didn't work out.  I
9  mean, it just went down from day one.  It got shorted
10  from day one, and it went from 30 to 40 cents down to
11  pennies and stayed there.
12     Q.  Why did you need to talk to this Terry guy?
13  What happened with the agreement and your arrangement?
14  What was going on?
15     A.  Well, we didn't understand why the stock
16  was getting pummeled down to pennies.  So what I was
17  trying to find out -- you know, What do we do?  I
18  mean, Do you want us to keep working on it?  Do you
19  want the stock back?  I was trying to give stock back,
20  actually, because, one, I didn't feel like I had done
21  that much work on it; and, two, it was at a penny.  It
22  had just gotten pummeled and I didn't work on
23  something unless I knew why it went to a penny.
24     Q.  How did you -- do you know how many people
25  you brought in to FormCap?

Page 175

1      A.  Not that many.
2      Q.  What do you mean by that?  How many is "not
3  that many"?
4      A.  Probably 15.  You know, some people, you
5  know, got stomped, got out of it.  You know, some
6  people held it.  You know, it was -- we could never
7  get any information.  The guy wouldn't call anybody
8  back.  He just, kind of, disappeared.
9      Q.  Did you share any of your -- the stock with
10  anyone?
11     A.  No.
12     Q.  Did you subcontract this out yourself to
13  anybody?
14     A.  Not that I remember.  It was such a short
15  deal.  I don't remember subbing it out to anybody.
16  Like I said, I still have all the 750,000 shares.
17         BY MR. GOTTSCHALL:
18     Q.  Mr. Becker, you may
19  have mentioned this already, but what is your
20  understanding of the relationship between Duke
21  Enterprises and FormCap?
22     A.  He was brought in to do investor relations
23  for the company, just like -- he did the same thing
24  that I did, but he thought it was too big a job for
25  him, so he subbed it out to me because I had worked

Page 176

1  with him in the past, a long time ago, like, ten or 15
2  years ago on other deals and had done a good job.  So
3  he called me up and asked me if I wanted to work on
4  the oil deal and told me where it was.
5         I did some research on it.  I thought it
6  might be something worth doing, but, you know, right
7  out of the gate, the stock started getting beat up
8  immediately.  It went up for a couple of days and then
9  it started getting beat up.  And then we couldn't get
10  a hold of the guy, and he told us not to do anything,
11  and then he was working on some stuff.  Then he just
12  dropped off of the face of the planet.  We never could
13  get a hold of him again.  I tried calling him many
14  times to give him the stock back.  You know, I still
15  have his stock.  I still have the 750,000 shares.
16         MR. GOTTSCHALL:  Okay.  Thanks.
17     A.  Even though it blew up, I didn't feel like,
18  you know, I deserved 750,000 shares for doing nothing,
19  even though it was at a penny.
20         BY MS. OSTROM:
21     Q.  And then on Exhibit No.
22  19, on the very first page, 1B, Kandi, K-A-N-D-I,
23  Technologies, you said that you purchased some
24  options, but you didn't have a consulting arrangement;
25  is that correct?

Page 177

1     A.  No, I think I gave you the option
2  agreements.
3     Q.  I think you maybe didn't hear my question.
4     A.  No, I didn't have -- I mean, I, kind of,
5  had -- I had one, kind of.  They wanted me to help
6  them -- you know, help them with investor relations,
7  but there wasn't free-trading stocks or restricted
8  stocks.  They said if I wanted to do it, then I would
9  have to, you know, get involved and purchase options.
10     Q.  Let me see Exhibit No. 19, just so I make
11  sure I say it correctly then.  You just didn't say
12  anything about it.  Is that why -- under 1B, you say,
13  Mr. Becker purchased 400,000 options in Kandi at $1.10
14  per share.  He later transferred a portion of these
15  shares to SLD Capital.  All documents pertaining to
16  Mr. Becker's relationships are enclosed.  You didn't
17  say anything about consulting on that.
18     A.  Well, I didn't mean not to do that.  I just
19  assumed you knew that I had done consulting.  All I
20  was trying to make reference to was that they didn't
21  have any free-trading shares, that if we wanted to get
22  involved, we had to purchase options.
23     Q.  Okay.  So you did have a consulting
24  arrangement with Kandi Technologies; is that correct?
25     A.  Right.

Page 178

1     Q.  Who was that with?  How did that come
2  about?
3     A.  That was through -- well, all the China
4  deals were Paul Kelly, but I think the options we
5  purchased were from a guy named George Tazbaz.  I
6  think he's the one that provided the options.  He was,
7  like, a real estate investor up in Canada or
8  something -- or Toronto.
9     Q.  T-A-Z-B-A-Z, does that sound right?
10     A.  Right.
11     Q.  So the arrangement, again, was through
12  Mr. Paul Kelly?
13     A.  Yeah.
14     Q.  What were the terms of this consulting
15  agreement?
16     A.  Same thing, just to provide investor
17  relations and investor awareness, and if they ever did
18  a PPM, to help them raise the money.  Eventually, they
19  did do a PPM, and I introduced them to Steven Rosner
20  again, who introduced them to some people.  And then
21  they ended up doing some other funky deal for money,
22  and the stock trades are about 2.75 a share now.
23     Q.  Did you bring any shareholders in to Kandi
24  Technologies?
25     A.  Yeah.  I mean, pretty much everybody that

Page 179

1  bought CALI and Guanwei bought the Kandi, too.
2     Q.  So about 50 to 60 people?
3     A.  It might have been a little bit more than
4  that.  They had a little bit more of an exciting
5  story, you know, with the electric cars and that kind
6  of thing.  It might have been 75, 80 -- 90 people,
7  something like that.
8     Q.  Now, did you actually give someone money to
9  purchase the options?
10     A.  No.  Actually, I'm on the hook still for
11  the $440,000, but, eventually, they said that since
12  everything went to hell in a hand basket, that I could
13  work it off, you know, maybe help them with some other
14  stuff down the road or help them -- you know, if they
15  did a PPM, raise some money or something and work it
16  off that way, but that was the original agreement, was
17  that I pay $1.10 a share.
18     Q.  Were you given the shares and you didn't
19  pay the money up front?  Is that what happened?
20     A.  Right.  Because at that time, I didn't have
21  the money.
22         MS. FILLMORE:  Just to be clear, you're
23  saying shares, and I think he purchased options.
24         MS. OSTROM:  I apologize.  Options.
25     A.  Yeah, I was given the options on the shares

Page 180

1  that I turned into stock.
2         BY MS. OSTROM:
3     Q.  So that's my next
4  question.  I should have said it in two parts.  I
5  apologize for that.  Did you then exercise the option
6  that you did purchase -- or that you did get?
7     A.  Right.  And then I gave some of the shares
8  to SLD Corp.  I'm trying to remember how many I did.
9  I think I did 200,000 to SLD.  Then I kept -- maybe it
10  was -- it was between 150 and 200.  I can't remember
11  the exact math, because I told them that at some
12  point, if I ever sold the stock, I was going to have
13  to pay the $440,000.  They were fine with that,
14  either -- you know, doing it that way, but it might
15  have been 150,000 shares.
16     Q.  You keep saying "they."  Is that --
17     A.  I'm talking about Tazbaz and Kelly.  They
18  were associates in some way.
19     Q.  So did you ever speak to anybody at Kandi
20  directly?
21     A.  Just when the company came to town and I --
22  they knew I was involved in investor relations through
23  Kelly.
24     Q.  When did Kandi come to town and where was
25  it?

Page 181

1    A.  Gosh, I think it was in New York when they
2  came to town.  I always met them -- they were always
3  coming in to do road shows to institutions and
4  brokerages and things like that, to see if they could
5  get some coverage -- picked up on.  So Paul would
6  always tell me where they were going to be and if I
7  wanted to come meet them and ask them any questions,
8  to come to New York or wherever they were at.
9    Q.  When was it that you entered into the oral
10 consulting arrangement with regard to Kandi?
11   A.  It was probably about the first part of
12 2010, too.  I think I sent the agreements.  It was
13 whenever those agreements were signed.
14   Q.  The stock options?
15   A.  Yeah.  It was shortly thereafter.
16   Q.  And did you directly ever speak to
17 Mr. Tazbaz?
18   A.  A couple of times.
19   Q.  And he was okay with you not paying for him
20 for the options up front?
21   A.  Yeah.
22   Q.  Is he the one that said you could work it
23 off with him?
24   A.  When everything kind of -- he said there
25 was no hurry, because he figured we would be in

Page 182

1  business down the road, which I'm not doing business
2  with anybody right now, because they're not doing any
3  Chinese deals.  He said I could pay him back down, you
4  know, the road if we did any more deals or if I came
5  into some money or something.  He wasn't in any big
6  hurry to get it.
7    It might have been 150,000 shares I gave
8  Rosner.  Because I was trying to figure out the math,
9  how much I would need to pay if I sold it at X price
10 to pay the 440,000 back, so I kept some back for that.
11   Q.  You just said Roger?
12   A.  No, Rosner.
13   Q.  Okay.  And that's SLD Corp.?
14   A.  Right.
15   Q.  Was Mr. Weil in on this or was this just
16 Mr. Rosner?
17   A.  I don't know.  If he did it, Steven did it
18 through him.  I don't know.
19       (Exhibit No. 25 was marked for
20 identification by the court reporter.)
21       BY MS. OSTROM:
22   Q.  Mr. Decker, let me hand
23 you Exhibit 25.  This is numbered SB253.  This is OBO
24 sheets for October 23rd of 2009.  On the left side --
25 on the right, it's October 26th of 2009.  Then there's

Page 183

1  a lot of handwriting on here.
2    A.  That's another Paul Kelly thing.
3    Q.  Just a second.  Did you produce this to the
4  staff?
5    A.  Yes.
6    Q.  And then you received this from Mr. Kelly?
7    A.  Yes.
8    Q.  And this is for the -- it says Kandi
9  Technologies Corp., correct, the issuer, underneath
10 the chart?
11   A.  Yes.
12   Q.  Whose handwriting is this?
13   A.  His.
14   Q.  So it came to you like this?
15   A.  Yes.
16   Q.  And is there anything on here that was of
17 importance to you or that you used in your business?
18   A.  No, he just thought these things were
19 beneficial to everybody.
20       (Exhibit No 26 was marked for
21 identification by the court reporter.)
22   A.  I never could figure these things out, so I
23 just really kind of shelved them.
24       BY MS. OSTROM:
25   Q.  Let me hand you Exhibit

Page 184

1  No. 26.  This is numbered SB376.  This is a shipping
2  airbill, the terms and conditions.  Did you send this
3  to us -- produce this to us?
4    A.  Probably.
5    Q.  Is that your handwriting?
6    A.  Yeah, it looks like it.  Yeah, I think it
7  is my handwriting.
8    Q.  The first part says, Talk to Paul about
9  building 3 to 5 percent IR on every deal.  What were
10 you referring to there?
11   A.  Because we talked about being down the road
12 that they were going to be -- he wanted us to come in
13 as partners, like the IR portion, be partners in the
14 group, but that never came about.  Actually, we were
15 trying to see what the -- what he had for every deal
16 that we could build into the initial thing instead of
17 going through -- because sometimes there wasn't always
18 enough for IR.  He, kind of, low-budgeted, because he
19 thought it was always going to be easy.  So we wanted
20 to see if we could build a little bit more into the
21 deal.  So if we had to subcontract other people out,
22 we could do it and still -- everybody could still make
23 a little money on the deal.
24   Q.  The next down on the left, it says, Paul,
25 and then in parenthesis, get more, and then K-N-D-I.

Page 185

1  Do you know what you referring to there?
2      A.  That's because he only gave us -- well, we
3  did the -- that was before we did the options, okay?
4  He said he couldn't do any other -- like, free
5  trading.  He couldn't do any free trading.  We'd have
6  to do options.
7      Q.  What was that note for?
8      A.  I don't even remember, to tell you the
9  truth.  Maybe that was before I even knew we could
10  get -- because, originally, he offered -- said he
11  could probably get a couple hundred, and I told him
12  that that probably wouldn't be enough.  And he said
13  that the only way we could do it is if we do options.
14  I think I wrote that note before we actually struck
15  the deal with the options.
16      Q.  In any of your consulting, how did you
17  arrive at how many shares you wanted as compensation?
18      A.  I just figured, you know, what expenses I
19  needed and if I was, like, solely working on their
20  deal.  Because when I did a deal, I only worked on --
21  I didn't, like, go out and find other deals and work
22  ten deals at once.  If I was with a group of people, I
23  stayed with that group and that was it.
24          So I figured out -- you know, if I wanted
25  to subcontract it out, you know, what I needed per

Page 186

1  month to live and things like that; and then I would
2  come up with a number over the course of -- whatever
3  they wanted me to do, six months or a year campaign or
4  two years or whatever.
5      Q.  How would you live off of stock
6  compensation?
7      A.  Well, because I would sell a little bit
8  here and here, or in my case, I margined it and
9  borrowed money against my account and ended up holding
10  it, riding it up, riding it down and never selling
11  anything.
12      Q.  So did you look at the stock price
13  currently and protect it forward to come up with the
14  number?  I mean, how did you decide that?
15      A.  Well, you can't ever figure out what you
16  think it's going to be at because you don't know.  I
17  mean, it could get shorted tomorrow and it could go to
18  ten cents.  So I just figured it based on current
19  price, you know, what I would need, because you can't
20  look down the road and say, Oh, I think this thing is
21  going to be $10 and base your whole, you know, life on
22  what you think it's going to be.  So I try to figure
23  out if I had to sell it all right here at $2, would
24  that carry me?  Could I pay my bills?  Could I pay my
25  expenses or could I subcontract out, or anything like

Page 187

1  that.
2      Q.  Now, if that was the only source of income
3  you had and you only worked one deal at a time, how
4  could you then hold the stock for the long term?
5      A.  Because I margined it.
6      Q.  You do that with every stock?
7      A.  Unfortunately, yes, I do.
8      Q.  Why would do you rather sell it?
9      A.  Well, it was hard for me to tell people to
10  buy it and me selling it.  So -- and, plus, I believed
11  in the long-term story.  Like, I thought Kandi might
12  be, you know, a ten or $12 stock.  That's what I did
13  in Bioenvision and made quite a bit of money.
14  Unfortunately, that works in about one out of every
15  ten of those stocks.
16      Q.  Now, were all the stocks, though, that
17  you -- all the companies that you did consulting for,
18  not all of their stocks were marginable; isn't that
19  correct?
20      A.  Well, these were.
21      Q.  But were -- Kandi was?
22      A.  Yeah, Kandi became marginable.  They all
23  became marginable.
24      Q.  You said "became."  What do you mean by
25  that, "became marginable"?

Page 188

1      A.  Well, they had to be over $3 a share.
2      Q.  So until they were $3 a share, you
3  couldn't --
4      A.  No, but that was usually right away.  I
5  mean, usually within the first few months, it was
6  right away.  I had money from other deals that we had
7  one -- two that I lived off of from -- you know, maybe
8  deals I had done in '04, '05 that I had made money on.
9  So, you know, I waited -- then when that money ran,
10  fortunately, these were marginable and I could borrow
11  more money from that.
12      Q.  So stock like Holloman never came close to
13  being $3 a share, correct?
14      A.  Right.
15      Q.  So how did you figure out the compensation
16  for Holloman if you knew right then it was in the
17  pennies?
18      A.  Because I had other money at that point.
19      Q.  But that's not what I asked you.  How did
20  you figure out how many shares you wanted to get from
21  them as compensation?
22      A.  Well, that was more -- well, you know,
23  800,000.  I mean, that was -- originally, they kind of
24  wanted me to do it for six months, and it was around
25  15 or 20 cents a share.  So a million shares -- at the

Page 281

1   but we just never got to that point and then we split
2   up.
3       Q.  Anything else?
4       A.  Not that I can think of, right off the top
5   of my head.
6       MS. OSTROM:  Mr. Fillmore, do you wish to
7   ask any clarifying questions?
8       MR. FILLMORE:  No.
9       MS. OSTROM:  Anything else, Kurt?
10      MR. GOTTSCHALL:  No.  I appreciate your
11  time, Mr. Becker.
12      THE WITNESS:  Thank you.
13      MS. OSTROM:  Mr. Becker, we have no further
14  questions for you today.  We may, however, call you
15  again to testify in this investigation.  Should this
16  be necessary, we will contact your counsel.
17      We are off the record 4:33 p.m.
18      (Whereupon, at 4:33 p.m., the examination
19  was concluded.)
20              * * * * *
21
22
23
24
25

Page 282

1           PROOFREADER'S CERTIFICATE
2
3   In the Matter of:  GRACE CONSULTING CORP.
4   Witness:        Shawn Becker
5   File Number:    D-03211-A
6   Date:           Friday, October 28, 2011
7   Location:       Kansas City, MO
8
9
10      This is to certify that I, Donna S. Raya,
11  (the undersigned), do hereby swear and affirm
12  that the attached proceedings before the U.S.
13  Securities and Exchange Commission were held
14  according to the record and that this is the
15  original, complete, true and accurate transcript
16  that has been compared to the reporting or recording
17  accomplished at the hearing.
18
19
20
21  _____  _____
22  (Proofreader's Name)      (Date)
23
24
25

Page 283

1
2           CERTIFICATE OF REPORTER
3   STATE OF MISSOURI  )
4                      ) ss.
5   COUNTY OF HENRY    )
6       I, Sheila R. Vogt, a Court Reporter and a
7   Notary Public within and for the State of Missouri, do
8   hereby certify that the witness whose testimony
9   appears in the foregoing deposition was duly sworn by
10  me; that the testimony of said witness was taken by me
11  to the best of my ability and thereafter reduced to
12  typewriting under my direction; that I am neither
13  counsel for, related to, nor employed by any of the
14  parties to the action in which this deposition was
15  taken, and further that I am not a relative or
16  employee of any attorney or counsel employed by the
17  parties thereto, nor financially or otherwise
18  interested in the outcome of the action.
19
20      _____
21      Notary Public within and for
22      The State of Missouri
23
24
25

Page 284

1
2
3   Diversified Reporting Services, Inc.
4   1101 Sixteenth Street, N.W.
5   2nd Floor
6   Washington, DC  20036
7
8
9   In the Matter of:  GRACE CONSULTING CORP.
10  Witness:        Shawn Becker
11  File Number:    D-03211-A
12  Date:           Friday, October 28, 2011
13  Location:       Kansas City, MO
14
15
16  This is a letter to inform you that we do not
17  release our tapes and notes.  I do maintain
18  them for a period of one (1) year.
19
20  Sincerely,
21      _____
22
23
24
25